**Amanda E. Lee**, *Pro Hac Vice*
lee@sgb-law.com
**Jeffery P. Robinson**, *Pro Hac Vice*
robinson@sgb-law.com
SCHROETER, GOLDMARK & BENDER
810 Third Avenue, Suite 500
Seattle, WA  98104
(206) 622-8000
Fax:  (206) 682-2305

Attorneys for Defendant McGowan

Local Counsel:
**Kelly R. Beckley**, OSB #74031
kbeckley@beckleyandlongtin.com
P.O. Box 11098
Eugene, OR  97440
(541) 683-0888
Fax:  (541) 683-0889

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>DANIEL GERARD MCGOWAN,<br><br>　　　　　　　　　　Defendant. | Case No. CR 06-60124-AA<br><br>MR. McGOWAN'S SENTENCING MEMORANDUM<br><br>Sentencing:  June 4, 2007 |

I.      **Introduction**

In 2001, Daniel McGowan joined with other defendants in this case to commit two arsons – one at Superior Lumber and one at Jefferson Poplar.  On the road to these two destructive fires, he had engaged in a significant number of acts of sabotage.  The larger story of Mr. McGowan, though, is one of a young man who, upon realizing that arson was incredibly harmful and counter-productive, returned to his roots in New York and started over.

Since 2002, Mr. McGowan has devoted his time, his energy, and his heart to helping women who are victims of domestic violence, to providing positive and compassionate support

to prisoners, to working on environmental protection through methods such as non-toxic recycling of computer parts and assisting indigenous populations in protecting their livelihoods in the rainforest. He organizes and sponsors truly free market community events based on principles of sharing for the common good. He is well-known in his community for his good works, and because of that he has enormous support in spite of his criminal past.

Mr. McGowan is prepared to receive this Court's sentence and he asks only that the Court take the time to see him as the complete individual that he is. Like all of us, he is a person of internal contradictions, and more than many of us, he is a person who carries a heavy burden of responsibility. His atonement began a long time ago, and he awaits a fair and just sentence.


## II.    Procedural Background

Mr. McGowan appears for sentencing on the counts in the Information, which include one count of conspiracy under 18 U.S.C. § 371, 12 counts of arson under 18 U.S.C. § 844(i), and one count of attempted arson under § 844(i). The arson counts arise from the arsons at Superior Lumber in Glendale, Oregon and Jefferson Poplar Farms in Clatskanie.

Mr. McGowan and three other defendants negotiated their plea agreements jointly. As will be described further below, Mr. McGowan was instrumental in bringing to the table the three remaining defendants in the case who, like him, were unwilling to provide information to the government on other persons who were charged in the case. After lengthy discussions, the parties reached an agreement that was satisfactory to all and the case was resolved. The government avoided a lengthy and very costly trial. The victims were spared the process of reliving the frightening experiences to which they were subjected by the defendants. Co-defendants were not required to undergo cross-examination about a dark episode in their lives.

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA 98104
(206) 622-8000

The global resolution also required Mr. McGowan to provide complete information about his own role in these offenses and any others he may have committed, which he did in two lengthy debriefings. Mr. McGowan's debriefings, as the government has noted, brought closure to a number of investigations of sabotage.

Under the terms of the plea agreement, we expect the government to recommend a sentence of 96 months. The defense may recommend a sentence of as little as 63 months or 18 months more than what the Court imposes on Ms. Savoie, whichever is lower.

At sentencing, the defense will recommend a sentence that is sufficient, but no more than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2), namely, punishment, deterrence, incapacitation, and rehabilitation.

## III.     Factual Background

### A.     Daniel McGowan and his Family

Daniel McGowan was born in Brooklyn, New York and raised in the community of Rockaway Beach in Queens until the age of 17. His father, also named Daniel, worked as a bus driver and a police officer. His mother, Frances, was primarily a homemaker, and also worked in a school cafeteria. Mr. McGowan has three older sisters – Michelle, Lisa, and Nancy.

Mr. McGowan did well in school, and pursued academic, athletic, and volunteer work. He had excellent grades and was in the Honor Society. He worked for the Environmental Club. He loved the outdoors and was an excellent cross country runner. His parents struggled financially, and he chose to attend college at the State University of New York at Buffalo.

Mr. McGowan's parents divorced in 1991, after 29 years of marriage. Mr. McGowan was 17 years old at the time. He lived with his father after his parents split up until he left for

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
(206) 622-8000

college.  His father has remarried and now lives in Oyster Bay, Long Island.  His mother continues to live in Rockaway Beach.

Mr. McGowan's family is very close-knit.  He spends a great deal of time with his sister Lisa and her family, and he is extremely devoted to her daughter Lily.  Mr. McGowan also visits regularly with his sister Nancy and with his parents.

In 2002, Mr. McGowan met Jennifer Synan.  They have been a couple since that time, and in May of last year, they were married.  Ms. Synan is an intelligent, well-educated woman who works in a management position for an arts non-profit organization.  As she describes in her letter to the Court, she has found Mr. McGowan to be a caring and comforting partner, and she has personally witnessed countless constructive and beneficial actions he's performed for others in the time they have been together.  Knowing his character from experience over time had led her to support him completely and chose to spend her life with him.

Mr. McGowan's family has been a source of tremendous support for him since the time of his arrest.  The McGowans are an ordinary working-class American family; Lisa McGowan has an excellent job in the packaging business and has been able to provide financial support for Mr. McGowan's defense and to post security for his release.  She and her family, as well as Nancy and Mr. McGowan's parents have all been exceptionally supportive of Daniel over the last year and a half.

Some of Mr. McGowan's family will be present for his sentencing hearing.  Ms. Synan will be in court at the time of Mr. McGowan's sentencing and would like to address the Court personally.  Ms. Synan's parents, from Houston, will also be present.  Lisa McGowan is pregnant and scheduled to deliver her second daughter on June 15.  Her doctor will not permit her to travel

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
(206) 622-8000

for any reason.  Mr. McGowan's mother had hoped to attend, but is too ill with hepatitis C to make the journey.

### B.    Education and Experiences Inspire Mr. McGowan's Interest in Environmental Activism

Mr. McGowan earned his Bachelor of Science from SUNY at Buffalo in 1996.  He majored in Business Administration and carried a minor in history.  His focus was Asian history. He worked with a particularly inspirational professor, John Larkin, to develop a plan to study abroad for a fifth year immediately following his last year in college.  His plan did not materialize as he expected, but he got his visa nonetheless and left for Thailand after graduation. The experience was life-changing.  Mr. McGowan had never been overseas, had never directly experienced a different culture.  Suddenly a place that he had thought he had come to know through books, articles, lectures and seminars, was a reality – a very different reality.  Mr. McGowan had left the United States thinking he might study abroad for a period of time and plan for a future in academics.  He quickly began to see the world differently.

Mr. McGowan's experiences in Thailand did not lead him to one particular epiphany or to a sudden moment of self-realization.  Rather, through a series of observations and encounters, views that had been settled in his mind became unsettled.  He saw untouched rainforest alongside extremely polluted and overcrowded urban areas with little or no environmental protection.  He visited urban prisons where American tourists were held on drug charges, and realized that although he had grown up in New York, he had never seen one of its prisons or met any of its inmates.  In the northern areas where indigenous tribes still live mostly off the land, he was surprised to find people wearing Coca-Cola t-shirts and asking him for money.  He visited

SENTENCING MEMORANDUM – 5

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
(206) 622-8000

logging areas and learned from non-profit organizations working there about the strong connections between protecting the environment and securing human rights.

Mr. McGowan was profoundly disturbed by the poverty in urban areas such as Bangkok – so much so that he gave away most of his money and had to get a job to sustain himself during the trip. He talked to employees of the hostel who were prostitutes at night for European and American tourists, and their stories only made him depressed and angry. The beauty of the rainforest and the cruelty of the poverty ripped his heart open, and Mr. McGowan returned home a different man.

Upon his return to New York, Mr. McGowan threw himself into volunteer work on campaigns related to environmental and human rights issues, such as a campaign to persuade the government of New York City not to purchase products from Burma. He worked with local environmental groups on projects as diverse as legislation to control the purchasing of rainforest wood products to getting a local bar frequented by an environmental group to stop buying beer from a company that did business with Burma.

Mr. McGowan was poor, and he moved in with his sisters in Rockland County. He searched far and wide and constantly for a job and finally landed one at a local mall, where he worked overtime every week to accumulate enough money to move back into New York City. His larger goal was to find a job with a non-profit environmental organization or something similar. Eventually, he was hired at the Rainforest Alliance, a non-profit organization that works to conserve biodiversity and ensure sustainable livelihoods by transforming land-use practices. The organization has branches operating world-wide currently; at the time Mr. McGowan worked there, its primary focus was on South American rainforests. His position required him to become the resident computer expert, which he did, and he also managed the office.

SENTENCING MEMORANDUM – 6

After working for Rainforest Alliance for about a year-and-a-half, in the fall of 1998, Mr. McGowan made plans to move to Humboldt County in northern California to participate in the non-violent campaign to save the Headwaters Forest. The Headwaters Forest Campaign had been ongoing for roughly ten years at that point, and efforts to save the old growth forest included the full range of tactics employed by the entire environmental protection movement, including litigation under the Endangered Species Act, staged media events, educational efforts, tree-sits, and blockades.

Mr. McGowan purchased a non-refundable one-way Amtrak ticket to San Francisco. Two days before his departure, he learned that a man involved in a protest was killed when a tree fell on him.[1] Due to the death, organizers of the campaign discouraged others from joining the effort in the Headwaters campaign for a time, so when Mr. McGowan arrived in San Francisco, he stayed with a friend, met new people, and worked on prisoner support and local campaigns related to agricultural biotechnology. To support himself, he worked at food cooperatives and took temporary jobs through an agency.

Mr. McGowan had, by this time, become very frustrated about the pace of environmental destruction he saw. When he traveled to the West Coast, he was deeply disheartened to see massive clear-cuts in the old-growth forests. At the same time, he grew more interested in the dangers posed by the introduction of genetically engineered crops into the environment. Mr. McGowan and people he came to know engaged in a number of direct actions together. Most of the actions were focused on damaging or destroying genetically engineered crops, primarily

---

[1] The protestor's name was David Nathan Chain. He died on September 17, 1998. The Humboldt County Sheriff's Office concluded the incident was an accident. The protestors involved in the campaign believed it was intentional. The tragic and unfortunate death of Mr. Chain reverberated through the community in much the same way Rachel Corrie's death has since she was killed in March of 2003 on the Gaza strip.

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
(206) 622-8000

those that are designed to resist the herbicide Round-Up.  Mr. McGowan also participated in staged media events in which pies were thrown in the faces of corporate officials.

### C.      Mr. McGowan Participates in the Arsons at Superior Lumber and Jefferson Poplar

Mr. McGowan moved to Eugene, Oregon in the year 2000.  He worked as an editor for the Earth First! Journal and continued on as a volunteer for most of the time he lived in Eugene. In the autumn of that year, he became connected with the group of people that are his co-defendants today in the Jefferson Poplar and Superior Lumber arsons.

Mr. McGowan was asked to be a lookout on the Superior Lumber arson, and he agreed. As will be discussed in greater detail below, this decision was entirely his own.  He was not pressured or cajoled into it.  Neither did he recruit others or persuade anyone to do anything.  His participation included a reconnaissance trip shortly before the arson, in late December of 2000, and he stayed in a house where fuel and devices were stored prior to the arson.  He served as a lookout for the arson in the early morning hours of January 2, 2001, and then traveled to Portland to assist in writing and releasing the communiqué.

Mr. McGowan also agreed to participate in the Jefferson Poplar Farms arson five months later, in May of 2001.  His role in this arson was significantly greater than in the Superior Lumber action.  He joined in reconnaissance several weeks before the arson, and he assisted in assembling some of the devices.  Contrary to the government's suggestion that it was his research that mistakenly identified James River as the owner of the farm, it was his reconnaissance that failed to disclose the error that others had already made.  He was fully aware that there would be another arson the same night that also focused on genetic engineering of poplar trees.

SENTENCING MEMORANDUM – 8

On the night of arson, he carried fuel to the main office on one side of the road and set incendiary devices there.  He went across the road and joined another member, whom the government has identified as Mr. Meyerhoff.  Mr. Meyerhoff located a propane tank and spoke to Mr. McGowan about using the gas inside to fuel the fire.  The "quick discussion" that the government has referred to consisted of Mr. McGowan expressing his opposition.  He knew nothing about propane tanks and it was not part of the plan that had been agreed upon.  Mr. McGowan left the shop area and went to the vehicle barn, where he assisted with the cloth trailers and fuel there.

### D.    Mr. McGowan Abandons the Group and its Tactics

Within a few weeks of the Jefferson Poplar arson, Mr. McGowan began the lengthy process of turning his life around.  Although he was not able to vocalize it at the time, the Jefferson Poplar arson was, he knew from news reports he read, a conflagration that did not further any cause he believed in.  Further, shortly after the Jefferson Poplar arson, Mr. McGowan and others met at Sisters, Oregon, in what the government refers to as the fifth "book club" meeting.  At the meeting, some people discussed escalating violent tactics, not retreating from them.  Whether the group was breaking up or not, Mr. McGowan was not interested in committing another arson.

Mr. McGowan's first big step away was a trip to Canada from July through October.  He spent much of his time in a remote area with friends.  He stayed in Bella Coola, several hundred miles north of Vancouver, B.C.  As set forth in the Affidavit of Catherine Ann Fletcher, attached as Exhibit C to Mr. McGowan's Motion for Release in this case (Dkt. No. 21), Mr. McGowan stayed with a family he had met in Eugene, and he spent time in and around the native Nuxalk

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
(206) 622-8000

community in the valley.  He helped with household chores, baby-sat Ms. Fletcher's children,

attended a potlatch.  He traveled under his own name.  He had weeks in which to reflect on why

he cared about the environment and human rights and whether he had taken the right path.

While he was in Canada, terrorists struck New York City, his home.

In October, Mr. McGowan returned to Eugene.  Within a short time, he decided to move

back to New York.

### E.     Mr. McGowan's Work Since 2001

When Mr. McGowan returned to New York from the West Coast, he also returned to the

kinds of work that he had been inspired to do from the time he first encountered indigenous

populations in fragile, threatened ecosystems.  He got a job at the Rainforest Foundation (not to

be confused with his previous employer, the Rainforest Alliance).  The Rainforest Foundation is

a charitable organization that works to support indigenous people and traditional populations of

the world's rainforests in their efforts to protect their environment and their human rights.  The

Foundation is unique in its approach to involving indigenous and native populations in

environmental protection, so that the work is equally focused on human rights protection.  Mr.

McGowan worked as the office manager at the Foundation for over a year, and it was at the

Foundation that he met his current employer, Elizabeth Martin of WomensLaw.org, because that

organization was sharing space with the Foundation.

### 1.     WomensLaw.org

Mr. McGowan joined WomensLaw first on a temporary basis through Blue Ridge

Foundation, a non-profit that provides support to human services-oriented non-profits when they

SENTENCING MEMORANDUM – 10

are starting up.  Later, WomensLaw hired him on permanently.  By this time, Mr. McGowan had earned a reputation as a smart, efficient, highly organized office worker.  These qualities were critical, because WomensLaw does its work with a tiny staff of just five employees.

WomensLaw is a truly unique organization providing an incredibly important service for victims of domestic violence.  Its founders, a group of lawyers, teachers, and activists, realized that there is a universe of legal and support services available to women in their communities, much of it literally at the touch of a button.  They believed it should be possible to get that information pulled together in one place that is updated literally daily by a committed staff, and to provide along with it a small group of women who are highly skilled at assisting victims in navigating the systems – legal, social, psychological – wherever they are.  The result is a website stunning both in its comprehensiveness and its approachability.  Sadly, not all victims have access to the Internet, but certainly our nation is approaching the point where a great many women can make it to an Internet café or a library and find the site on Google.

A woman who goes to Womenslaw.org will find not only general information on domestic violence and how to recognize threats and escalation.  She will find information specifically geared toward teenagers, women in the military, women in tribal communities. There are pages with simple instructions on how to ensure the abuser cannot determine that she is reading domestic violence information, and how to protect her e-mail account.  More to the point, there is a database with information specific to each state in the country, each US territory, and to military bases and tribal reservations.  A woman living in Oregon, for example, can access instructions on how to obtain a restraining order anywhere in the state, complete sets of downloadable court forms, the contact information for every courthouse and every sheriff's office.  There are also links to a wide variety of state-based support groups and organizations,

SENTENCING MEMORANDUM – 11

including state and local domestic violence organizations and shelters, child support assistance, and legal aid.

WomensLaw receives over 80,000 unique new hits per month, and its e-mail hotline logs 350 new contacts each month. The service has proven to be incredibly valuable to those who use it. Recently, with the assistance of outside funding, WomensLaw was able to help a victim get a ticket to fly back to her home country. She had been brought to the United States 25 years ago, when she was quite young, by a man who proclaimed his love. When she arrived, she was imprisoned in a basement and forced to work as a prostitute. She escaped and contacted WomensLaw for help. They helped her get to a local shelter and walked her through her legal options, including getting her to her country's embassy. The embassy helped her find her family, and WomensLaw helped her get home. When she received the ticket, she wrote to the organization, saying

> *Thank you so very much! There is not enough words can describe the feeling that I have in my heart now. Thanks to you I can be with my loving family after all. I feel like I survived a disaster. … You gave me back everything that I lost, my hope, my family, my success and much more, my life!*

Mr. McGowan is honored to play a part in the work of WomensLaw. He provides web assistance, updating the site constantly, which is a crucial element of the organization's success. He was instrumental in helping to put together the Internet and e-mail security information for the site. He does fact-checking of all kinds of information prepared for the site, writes thank-you letters to donors, updates the accounting database, deposits and cashes checks, obtains supplies, and handles mailings.

As the letters from Ms. Martin and his coworkers demonstrate, he is a valued and very well-liked employee. He is also the only man in the office. While he does not interact directly with victims who contact WomensLaw, he believes that is appropriate, because he assumes that

SENTENCING MEMORANDUM – 12

victims would not want to discuss their situations with a man.  Mr. McGowan has found the work to be tremendously rewarding.  To him, domestic violence is not an issue for abusers and victims alone; it is an issue that men should address more openly, and it is an issue for communities to address together.

### 2.      Prisoner Support Work

Mr. McGowan was involved in prisoner support work prior to the time of the arsons, and his work increased significantly afterward.  The prisoner support Mr. McGowan champions consists of ensuring that inmates have funds in their commissary accounts, so that they can buy food and supplies they need; visiting and writing letters to prisoners so they feel emotional support while they serve time; sending books to prisoners through organizations such as Books Through Bars, which accepts donated used books of history, language, sociology, psychology, poetry and memoirs; and donating to legal funds for prisoners with active appeals.

What the government characterizes in derogatory terms and attempts to link to ongoing support of violence is in fact evidence of compassion and caring for people who are suffering.  Mr. McGowan's workshops and statements related to prisoner support nowhere advocate for criminal action or attempt to justify the crimes.  In the case of Jeff Luers in particular, whom the government singles out in its brief, Mr. McGowan's support activities were focused not only on alleviating the isolation of prison, but also on garnering financial support for his appeal, which has ultimately gained Mr. Luers a resentencing hearing.  Mr. McGowan is hardly alone in his belief that the punishment of 23 years in prison was excessive for the crime Mr. Luers committed.  What distinguishes Mr. McGowan from most others is that he was told who committed the Romania arson at the beginning of Mr. Luers' trial, he was shown the

SENTENCING MEMORANDUM – 13

communiqué and failed to get it altered, and he shouldered a personal sense of responsibility for the consequences to Mr. Luers.

Mr. McGowan has provided support to many prisoners other than Mr. Luers. Some are anti-war protestors, some are animal rights activists, some committed crimes related to environmental protests. He also made arrangements to get books sent to three inmates he met while he was being transported across the country from New York to Eugene. He had many books while he was in custody at Lane County Jail. He left half of them behind in the day room and donated half to the prison libraries.

It is too easy for the government to say that acts of kindness toward prisoners are a denigration of the victims of crime. It is a narrow and uncharitable view of human nature. Mr. McGowan has earned a place in prison by victimizing the people who owned and worked at Superior Lumber and Jefferson Poplar. He did not harm them more when he showed compassion for someone else.

### 3.        Really Really Free Markets

In addition to his job at WomensLaw and other volunteer activities and prisoner support work, Daniel finds time to organize Really Really Free Markets. Most recently, he organized a free market on October 14, 2006, shortly after he was released from electronic monitoring.

The concept of the Really Really Free Market is that people in the community have what is needed to share with one another, and goods and services do not need to be purchased. The free market is not a barter fair or an exchange. The market brings together the local community to share goods and services entirely for free. Nothing is for sale, and the only rule is share and

SENTENCING MEMORANDUM – 14

share alike. It is particularly focused on connecting those who have a strong means of support with those who don't, so that the entire community feels more connected.

Mr. McGowan has worked on a number of free markets, and organizes them by reserving space for hundreds of people, often at a local church, arranging for entertainment and musicians, locating piñatas and face-painters for the children, lining up food donations so that all who come may eat or take away groceries, and preparing and distributing flyers and advertising for the event. The work includes talking to hundreds of people to arrange for services such as massages, haircuts, bike repair and the like to be offered, as well as drumming up donations of used clothing, furniture, books and movies, household items, and all the other things one would ordinarily find in a yard sale.

The Really Really Free Markets have been a success in the best sense of the word: people come and have fun, they eat, they meet one another and make new friends, they share their services and skills with those who need them, they get items they need or see that items they are done with end up with someone who will use them. It is work like this, which Mr. McGowan does purely out of his sense of what is the right way for people to treat one another, that dominates his time, his energy, and his thoughts.

IV.    **Sentencing Issues**

A.    **Role in the Offense**

Neither the government nor the Probation Office is recommending an adjustment under Guideline section 3B for Mr. McGowan's role in the offense, and we agree that none is appropriate. With respect to the Superior Lumber arson, Mr. McGowan was a lookout, and he

SENTENCING MEMORANDUM – 15

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
(206) 622-8000

also stayed in a house where fuel was stored along with others involved in the offense. The group of people involved was small and his role was neither one as a leader nor was it minimal.

The government asserts that Mr. McGowan "brought Suanne Savoie along into" Superior Lumber. Based on Ms. Savoie's statements to the government, that is false. As indicated in the report of her interview with the government on January 31, 2006, she had met many members of the group of people involved in these arsons as early as 1999. She attended "book club" meetings in Tucson, Arizona in the summer of 2000 and in Santa Cruz in the fall of 2000. She told the government that, for purposes of the Superior Lumber arson, it was Chelsea Gerlach and Stan Meyerhoff, both "book club" members, who introduced her to Kevin Tubbs and Jacob Ferguson, and vouched for her. FBI 302 of Suzanne Savoie at p.6 (January 31, 2006), Bates No. Savoie 302-9. The government's assertions may be based on their misapprehension of the nature of Mr. McGowan's and Ms. Savoie's relationship. Mr. Ferguson told the government many times that Mr. McGowan and Ms. Savoie were romantically involved. Other than a very brief relationship when they first met, they were not romantically involved; they were just friends. Mr. McGowan had no special place in her life.

With respect to the Jefferson Poplar Farms arson, Mr. McGowan's role was similar to that of others who were actively involved. He joined in assembling devices along with a number of people, as he described in detail to the government in his debriefing. He participated in driving to the location once prior to the arson, along with others, as well. And he participated actively in placing devices at the scene, as did others.

The government is correct that Mr. McGowan was involved in research. He had conducted Internet research on genetic engineering of crops and trees for some time when he became involved with this group of people. He knew that James River was involved with the

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
(206) 622-8000

Tree Genetic Engineering Research Cooperative when he was invited to join in the arson, and he certainly agreed with the decision to commit an arson at Jefferson Poplar Farms. It is wildly inaccurate to suggest that he transformed the action from a sabotage action into an arson. As was made clear during Ms. Gerlach's sentencing, and is clear from her own statements to the government, she and another member of the group had done their own research and selected the farm as a target for arson based on its involvement in TGERC. See, FBI 302 of Chelsea Gerlach at p.18 (January 28, 2006), Bates No. Gerlach 302-78 and FBI 302 of Chelsea Gerlach at p.10 (January 31, 2006), Bates No. Gerlach 302-78. McGowan shares responsibility with others who participated in the reconnaissance close to the time of the arson for failing to realize that James River was no longer the owner of the farm and that the farm was no longer a member of the cooperative. Assuming he was more skilled at research, he bears more responsibility. This particular failure does not merit a role adjustment, however, under any plausible reading of § 3B1.1.

Mr. McGowan attended three of the meetings the government refers to as "book club" meetings. He did not attend the meeting in Eugene or the one in Arizona. The first one he attended was in Santa Cruz in the autumn of 2000. He also attended the meeting in Olympia, at which a variety of personal issues surrounding one member were discussed. Although he and others attended one further meeting, in Sisters, Oregon, in the summer of 2002, Mr. McGowan did not, as the government seems to claim, play some unique role in keeping the group together. At the meeting in Sisters, Mr. McGowan was present when others discussed an increasing level of violence, specifically direct violence toward people. Mr. McGowan rejected that idea completely and did not participate with the members of the group after that.

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA 98104
(206) 622-8000

Mr. McGowan had no role, ever, in the overall planning of an arson or in assembling a team for an arson. He did not cajole, lure, or pressure others into taking part in any arson. He made his own decision to participate, and he believed others did as well. He did not design or improve devices. Under all of the circumstances, his conduct in the offenses does not warrant a role adjustment under the terms and application principles of U.S.S.G. § 3B1.1.

### B.    "Aggravating Factors"

Although there is no specific guideline provision for "aggravating factors," the government points to a number of facts and allegations that it argues should be factored into the Court's sentencing determination. The government states that Mr. McGowan is nothing short of a mindless criminal, that he is dedicated to enforcing a code of silence, and that from statements he made to Jacob Ferguson in 2005, anyone can tell he has not changed one bit from the time he committed the arsons in 2001.

The more accurate view, by far, is that Mr. McGowan has come a long, long way since 2001. The government overstates his actions prior to the arsons, and ignores the extent of his transformation since them. While Mr. McGowan continues to believe in the importance and necessity for dramatic changes in our nation, he pursues his beliefs in an entirely different way. And as demonstrated by the many letters submitted to the Court, he has already touched dozens, if not hundreds, of peoples' lives in a personal, compassionate, and thoughtful way since 2001 – in stark contrast to the frightening and devastating actions he took in the past.

//

//

SENTENCING MEMORANDUM – 18

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA 98104
(206) 622-8000

### 1.    Biotic Baking Brigade

The government argues that Mr. McGowan has a violent history of assaults, based on his participation in pie throwing events staged by the Biotic Backing Brigade.  The ancestry of the BBB likely goes back centuries, to a time when unhappy civilians demonstrated their opinions with rotten vegetables and fruit, but in the modern era it can be traced directly to Noel Godin, a Belgian author and historian who has been leading people in pie-tossings since the 1960s.  The targets range from celebrities to politicians to corporate executives – people who Mr. Godin and his compatriots identify as having a "limited sense of irony."

Pie-tossing has actually been studied as political theater and part of the wide range of oppositional politics by academics the world over.  It turns up in academic journals on mass media and PhD theses on sociology.  Far from being treated as a crime, it is generally considered to be a prank, a comically subversive form of performance art.  As Mr. Godin explained in an interview, "[t]he victim is only injured in his self-esteem. We take a lot of care that the pies can't hurt physically. The pastry is soft and full of cream."   So far as the defense is aware, no person was ever harmed through Mr. McGowan's participation in pie-tossing.

### 2.    Other Uncharged Conduct

The government notes that Mr. McGowan has been involved in a large number of criminal incidents for which he was not prosecuted, and that is correct.  The overwhelming majority of Mr. McGowan's criminal actions involved mischief and sabotage, such as pulling up genetically engineered crops and damaging a forest road, or trespassing, such as chaining himself and cement-filled buckets to the door of a store that sold fur.

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
(206) 622-8000

Mr. McGowan and others in this case also participated in the sabotage during the World Trade Organization protests.  Contrary to the government's provocative suggestion, the protests had little to do with President Clinton's visit to the area.  Given the wide margins drawn around the actual meeting site and guarded by heavily armed police, most of the sabotage activity went on in the surrounding retail areas of downtown Seattle.  Members of the affinity group discussed entering and engaging in property destruction at the waterfront grain elevator.  The government's suggestion that the plan was rejected to avoid a conflict with longshoremen misses the mark, however.  The group members did not want any confrontations that would potentially harm people, and they realized that there was no way to enter the facility without creating a situation that they would not be able to control.

Mr. McGowan's history of crimes and actions is notable also for what it does not entail. He did not possess, use, or store firearms, ever.  He did not work on designing incendiary devices or making them better.  He did not set out to develop explosives or to export that technology.

Mr. McGowan did not grow or sell drugs to make a living or to contribute to the drug lifestyle of others.  He worked ordinary, paying jobs and supported himself.  He did not make false identifications or use them.  He did not travel under assumed names, or use assumed names for credit, for renting a place to live, to avoid creditors.

### 3.    Recorded Conversations with Jacob Ferguson

The government argues that Mr. McGowan's true character is revealed in a series of surreptitiously recorded conversations he had with Jacob Ferguson in 2005.  Mr. Ferguson and Mr. McGowan had no contact at all after Mr. McGowan left Eugene in 2001 until Mr. Ferguson

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
(206) 622-8000

appeared unexpectedly at an animal rights conference in New York City in April or 2005.  Mr.

McGowan was hosting a table with information on prisoner support and presenting a workshop

on the subject of the legal system and the importance of prisoner support.  Over the next two

days, and then on two days in August of 2005, Mr. Ferguson approached Mr. McGowan and

covertly recorded him.

The government has extracted portions of the tapes to support its argument that Mr.

McGowan is an unreformed, unrepentant criminal, and – most importantly – to demonstrate that

he will commit new crimes.  The reality is that Mr. McGowan's actions over the past nearly six

years demonstrate the opposite, and even the taped conversations do not support the

government's conclusion.

First, it is important to understand that Mr. Ferguson came to Mr. McGowan, not the

other way around, and he brought up the subjects of the past.  Mr. McGowan did not venture into

the past on his own.  When Mr. Ferguson asks Mr. McGowan how he is and what he's up to, Mr.

McGowan tells him about acupuncture school and about how his sister had a baby and he moved

back to be close to "the family" – his family, the McGowan family.

When asked about seeing Mr. Meyerhoff a year or so earlier, Mr. McGowan said it had

been hard:

| MCGOWAN | It was, it was too like, like in some ways I like, I left that part of my life.  And it was a fuckin' cruel like reminder, that like, that part, I mean, you never leave, you know. |
|---------|---|

Bates No. CW 729.  While Mr. Ferguson tries to bring up the past, Mr. McGowan tells him

about his prisoner support work and talks about how much respect he has gained for people who

have introduced him to the wisdom of older people – former inmates who have done very hard

time and who have much to share.  He specifically refers to Ed Mead, who served 18 years in

SENTENCING MEMORANDUM – 21

prison and worked to stop rape in Washington's penitentiary at Walla Walla.  They talk at length about the grand jury investigations and who they believe may have cooperated and who they believe has not.

The government also isolates portions of a conversation Mr. Ferguson and Mr. McGowan had on August 15, 2005 in Eugene.  The day of this meeting, Mr. McGowan had just returned from seeing Jeff Luers in prison for the first time.  That meeting with Mr. Luers had a powerful effect on him.  His past came back to him strongly that day, and his words reflect a mixture of anger, bravado, and concern about getting caught.  He spoke in strong terms about his past association with Mr. Ferguson and the other group members.  As the government notes, he talked about Vail as a "recruitment drive," – because of course it was what recruited him.  He also talked about how he saw all of what was going on at the time – the whole range of crimes from sabotage to the arsons – as "militant symbolism."

It may be fair to say that Mr. McGowan did not sit down and chat with Mr. Ferguson and denounce his past, confess his sins, or express shame and regret.  Yet his actions speak far more loudly than the words on one emotional day in his life ever could.  The government must admit that Mr. McGowan had ample opportunity to continue his involvement with criminal activity.  He was not arrested for nearly five years after the Jefferson Poplar arson.  He had learned how to commit arson in his time in Eugene, and he certainly could have continued down that path had he chosen to.  He did not.

When a defendant offers words of remorse at the time of sentencing, the government often asks the Court to look at the person's behavior as the best and most reliable indicator of his or her state of mind.  Here, the government asks the opposite.  The government's rhetoric about Mr. McGowan's recent and current state of mind is in fact completely contradicted by his

SENTENCING MEMORANDUM – 22

everyday actions – actions that, just like this conversation, he has no reason to believe are being monitored.  As discussed in the factual statement above, Mr. McGowan's acts in his life after the Jefferson Poplar arson demonstrate far more plainly than a conversation with an informant ever could what direction his life has taken and where his true character lies.

### C.     Substantial Assistance Motion

As the Court knows, Mr. McGowan negotiated a plea agreement with the government that resolved this case with the government as to himself and three other defendants.  The idea of the global resolution originated with Mr. McGowan and he deserves much credit for persistence and patience in working with the government to seek an agreement that was satisfactory to all.

The Court has spoken highly of the cooperation provided by some defendants to the government – cooperation in the form of "naming names."  Cooperation of that nature is often of great assistance to the government in solving a crime and it is deservedly rewarded. Nonetheless, in a democratic society such as ours, based on a constitution that promises enduring protection of silence, cooperation is never a requirement, and a person's considered decision not to "name names" should not be a factor that leads to increased punishment.  The government has no right, and indeed no moral claim to, evidence from one who stands accused.  One defendant may choose to reduce his or her punishment by informing on others, while other defendants may equally justifiably choose not to do so.

Mr. McGowan's decision to not cooperate with the government was entirely his own. Far from being an issue of loyalty or obligation to fellow criminals, as the government has suggested, for Mr. McGowan the decision boiled down to honoring a commitment he made to himself not to discuss what other people did and a decision to allow each individual to make his

SENTENCING MEMORANDUM – 23

or her own decision to do what was best for himself or herself. Mr. McGowan found it unconscionable to solve the problem he was facing – a possible mandatory life sentence – by simply shifting the burden onto someone else.[2]

Mr. McGowan was, however, willing to admit to his crimes, describe them in detail, and do everything he could to persuade others to resolve the case as well. Mr. McGowan supported an attempt to resolve the case pending in Washington State at the same time, but that effort ultimately did not succeed.

After many weeks of talks, the government and the four remaining defendants reached a global agreement. Mr. McGowan then participated in two lengthy interviews and provided a wealth of detail about the arsons and other events in this case, as well as about his crimes and other actions leading up to the arsons. While it was clear that the government had substantial information already about Mr. McGowan's participation, his interviews answered a great many unresolved questions, and he candidly told the government about things he did that the government knew nothing about prior to the meeting. His statements essentially closed many open and unresolved investigations. He did not minimize his role. He certainly forgot details, and in this way he was no different from others involved in the crimes. When confronted with evidence that he had reported something that conflicted directly with what others had said, Mr. McGowan was sometimes able to recall that he had misremembered. Other times, he simply wasn't sure. There was nothing self-serving about his statements.

We anticipate that the government will honor its agreement and move for a downward departure for substantial assistance under 5K2.0. As the Court noted at the sentencing of Ms.

_____

[2] This is one of the reasons Mr. McGowan was not interested in meeting with Ms. Gerlach. While he understood that she had made a difficult decision that she felt was appropriate, he had already made his own decision. While Ms. Gerlach's decision and her process in reaching it may

Gerlach, one of the notable features of this case has been the professionalism on both sides of the table. We believe that the government's promise to make the motion is due partly to the recognition that the global resolution does provide assistance to them that is substantial. A very lengthy and costly trial has been avoided. The victims have been spared the additional trauma of reliving the experience of each of the arsons by testifying and seeing more photos and video. Co-defendants who made difficult decisions have been spared additional time in local jails and extensive cross-examination. Investigations that have languished for a years and seen the statute of limitations run have been solved. We do not ask the Court to minimize the decision of any defendant who decided to "name names." We are asking the Court to recognize that Mr. McGowan should not be punished more severely because he found a different, but very significant, way to assist in resolving the case.

The global resolution could not have occurred without the effort of all four of the remaining defendants and the agreement of the government that the recommended departures were reasonable. We therefore request that the Court grant the motion.

### D.       Terrorism Enhancement

The defense renews its objection to the imposition of the terrorism enhancement under U.S.S.G § 3A1.4. The Court has already repeatedly rejected the application of the terrorism enhancement for the arson at Superior Lumber, on the basis that the evidence does not suffice to demonstrate that the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. The Court has relied on the communiqué in Superior Lumber, which focuses on the conduct of the corporate entity, holding

---

have had an effect on some defendants, it played no role in Mr. McGowan's decision to resolve the case or how to go about it.

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
(206) 622-8000

it demonstrated only an intent to influence the conduct of corporations or to retaliate against them.

There are at least two reasons why the Court should reject the application of the terrorism enhancement to the Jefferson Poplar arson.  First, while the complete absence of a nexus between government and an offense surely defeats the terrorism enhancement, as in the case of Superior Lumber, it does not follow that any reference to the government qualifies the offense for the enhancement.  The enhancement applies only if there is clear and convincing evidence to prove that the offense was motivated by the listed purposes.  The possibility of such a motivation is not enough.

Second, if the only evidence related to the motivation for the offense is the act itself and the communiqué, then doubts about the interpretation of the language should be resolved in favor of the defendant, as dictated by the rule of lenity.  "In general, the rule of lenity requires the sentencing court to impose the lesser of two penalties where there is an actual ambiguity over which penalty should apply."  United States v. Jolibois, 294 F.3d 1110, 1113 (9th Cir. 2002). Here, even after careful analysis of the statutory language, legislative history, and underlying policy of the terrorism enhancement, there remains considerable doubt about whether it should apply to an arson such as Jefferson Poplar, where the only evidence of any kind purporting to link the arson to the government is the communiqué.

Not a single cooperating defendant in the case has told the government, so far as we are aware, that the reason for the arson was to influence or retaliate against the government.  Indeed, those who were asked knew nothing of the kind.  The evidence from the government's own interviews  and its representations to the court demonstrate that the communiqué was altered by Mr. Rosebraugh, who is not alleged to be a conspirator, after it was sent out by Ms. Gerlach.

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
(206) 622-8000

The scope of those alterations has never been disclosed by the government. As Ms. Gerlach told the government in an interview in January of 2006, "the entire communiqué was different" after Mr. Rosebraugh released it. FBI 302 of Chelsea Gerlach, at p.11 (January 31, 2006) (Bates No. 302-79). The government cannot demonstrate by clear and convincing evidence that the communiqué even said anything about legislation when it was originally provided to Ms. Gerlach.

Further, the language itself is susceptible to many different interpretations, retaliation against the government being the least plausible. Nothing about the language indicates the arson was motivated by a desire to punish the legislatures of Washington and Oregon for any legislation. As to influencing the conduct of the legislature, it is inherently unlikely that this group of people would express their motivation to prevent new legislation criminalizing their actions by committing new crimes.

The communiqué focuses almost entirely on the group's motivation to stop the genetic engineering of trees. The language about legislation, taken in the full context of the communiqué, stands more as a message to the corporate leaders that only when they stop putting genetically engineered trees into the ecosystem – not by seeking more legislation – will they see the end of the arson attacks. As with the Superior Lumber arson language, it is indeed strong, but there is no clear and convincing evidence that it was a message to the government.

### E.     Rehabilitation and Work in the Community

As described in the factual material above, Mr. McGowan made the terrible choice at the end of the year 2000 to engage in acts of astonishing destruction. A few months later, he turned his back on arson and sabotage and restructured his life. He continues to be a very committed

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA 98104
(206) 622-8000

social and environmental activist.  What he does today, however, would hardly be recognizable to those who joined him in crimes in 2001.  As described above and as detailed in letter after letter we received from people who know Mr. McGowan, he is a dedicated member of his community who works tirelessly on efforts to assist other people.

Viewed in the context of his adult life, it is less the transformation of a violent person into a non-violent one as it is the growth of a person who wants to contribute to making extraordinary changes in our society and has learned that those changes are made through contributions to your community, not harm to it, through helping victims, not creating them, through providing access to education and moral support, not burning property and shutting down the debate.  Mr. McGowan's personal path across the line into criminal activity and back again went on far longer than the time between just the two arsons.  Yet the arsons remain a somewhat isolated episode, a period of a few months when his decision-making was horribly wrong.  And when Mr. McGowan walked away and in particular when he began re-centering himself around the things that matter to him, his rehabilitation was extraordinary.

This memo and the letters to the Court address his work at WomensLaw, his volunteer efforts in prisoner support and his community work organizing Really Really Free Markets.  Mr. McGowan also organizes computer recycling events in his community, to ensure that these recyclable items do not end up in toxic sites in Africa and Asia.  Since the time of his plea, he has begun researching the Bureau of Prisons computer recycling program, educating himself about the studies, lawsuits, and whistle-blower reports that have shown that BOP employees and inmates have been exposed to large amounts of toxic and carcinogenic materials in unregulated and unmonitored BOP recycling shops.  If he serves time in a facility with one of these shops, he hopes to be involved in work related to protecting employees and inmates from exposure to toxic

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
(206) 622-8000

materials and ensuring that recycling is done according to federal occupational standards that apply outside the BOP.

Mr. McGowan did not necessarily embark on a new life in 2002 to make amends for the one he was abandoning. He simply wanted to live his ideals, rather than imagine what the world would be like if others shared them. He is sad that he lost his way and that he de-humanized others to the point that he could do the kind of harm he did. At the same time, he draws strength from the knowledge that he is well-loved and supported and that he has time and energy to continue to be a positive influence for change.

## V.    Specific Objections to Final PSR

The defense noted numerous objections to the draft presentence report. Today we received the final presentence report. We understand the enormous burden on the Probation Office in this case and we realize that using the full fourteen days to submit objections made it impossible for the Probation Officer to have a final report to us any sooner. It is our understanding that certain changes in the final may be corrected with the assistance of the Court. We request permission to submit a supplemental letter or brief to the Court to address specific final objections to some remaining factual issues that have not been corrected in the presentence report.

## VI.    Placement and Conditions of Supervised Release

**Placement at FCI Fort Dix, New Jersey.** Mr. McGowan requests that the Court assist him with securing placement at the low-security facility at FCI Fort Dix in New Jersey. FCI Fort Dix is reasonably close to his family and will allow him to remain close to the community that

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
(206) 622-8000

will provide key support to him while he is incarcerated. It is particularly important to him to be able to visit regularly with his wife, his parents, his sisters, and his niece. Also, he wishes to pursue the Masters degree program he has begun at Antioch University, and a low security facility will make it possible for him to pursue his education and work while he is incarcerated.

**Voluntary Surrender.** Mr. McGowan also requests that he be allowed to self-report to the facility to which he is designated. He has been released on bond since September of 2006, and prior to that was on electronic home monitoring. The bond securing his release is substantial. His performance on pre-trial release has been flawless, and the Probation Office recommends he be allowed to self-report.

Further, Mr. McGowan is currently enrolled in the first quarter of his master's degree program. His term ends on approximately June 11. If he is remanded into custody prior to that date, he will flunk his courses, lose the entire quarter of work along with the time and money invested in it. It will naturally have a negative impact on his degree program.

Self-reporting also affects the security classification process. Inmates who self-report are presumed to be less of a flight and safety risk and they therefore receive a three point reduction in their security classification score. This clearly can affect their designation and placement. Remanding Mr. McGowan would appear to contravene the Court's statements that statements that have shown deep appreciation for the negligible risk that these defendants pose and concern that they be placed in institutions that are appropriate.

Mr. McGowan has been preparing to go into custody during the months since he entered his plea. He knows this is a luxury others have not had. His affairs are in order. We do not request that he be allowed to self-report so that he can have more time with his family, his wife,

SENTENCING MEMORANDUM – 30

or his friends.  We request it so that he will not lose educational credits he has been working for all of this term and so that he is more likely to receive a fair security classification.

**Waiver of and interest and financial conditions during incarceration.**  Mr. McGowan requests that the Court waive interest on the restitution order, as provided for in 18 U.S.C. § 3612(f)(3), due to his inability to pay.  Further, Mr. McGowan requests that the judgment reflect that payments are suspended until he is released from prison.

**Mental health treatment.**  Mr. McGowan objects to the special condition of participation in a mental health treatment program approved by the probation officer.  There is nothing in Mr. McGowan's personal or medical history to suggest he suffers from a mental illness.  He has been in therapy for some time, as a matter of personal choice.  His therapist has not diagnosed him with a mental disorder or illness and has not suggested he requires treatment.  This proposed condition should be eliminated.

**Membership and association conditions**.  The defense objects to the special conditions prohibiting contact with individuals involved in activism and membership in organizations whose primary purpose is environmental and animal rights activism.  Mr. McGowan understands that association with felons and co-defendants is prohibited.  Further, the Court may impose special conditions of supervised release that are designed to prevent a defendant's reversion into a life of crime.  United States v. Bolinger, 940 F.2d 478, 480 (9th Cir. 1991) (citing Malone v. United States, 502 F.2d 554, 556-57 (9th Cir. 1974)).  However, due process prohibits imposing a condition that is "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application."  United States v. Hugs, 384 F.3d 762, 768 (9th Cir. 2004), cert. denied, 544 U.S. 933 (2005).  Merriam-Webster defines "activism" as a practice that emphasizes "direct vigorous action" in support of or against a controversial issue.  The term

SENTENCING MEMORANDUM – 31

"direct vigorous action," like "activism," has no legal definition and does not equate to criminal action.  There are likely hundreds of organizations that define themselves as activist which counsel no more than letter-writing, community-building, lawful protest, and other forms of protected activity.  Shutting Mr. McGowan out of these organizations, and denying him association with his peers, is not only a violation of fundamental rights for no good reason, it is anti-rehabilitative.

Further, supervised release conditions, under both the guidelines and the statute, are to involve no greater deprivation of liberty than is reasonably necessary to achieve the desired goal, which here presumably is the prevention of future crimes.  See 18 U.S.C. § 3583(d).  In United States v. Peterson 248 F.3d 79, 83 (2d Cir. 2001), the Second Circuit rejected the imposition of a condition of supervised release that prohibited a sex offender from using the internet, explaining not only that the condition was overly broad, but that there was no indication that the defendant's sex offenses had any connection to the internet.  Similarly, here, the proposed conditions are enormously broad and would potentially relate to dozens, if not hundreds, of Mr. McGowan's friends and acquaintances, depending on what the term "activist" means.  There has been no showing, nor is one likely to be forthcoming, that any of these individuals or any of the organizations that Mr. McGowan is currently closely affiliated with, are connected to criminal activity.

Rather than subject Mr. McGowan to a process in which he must seek permission for every friend, acquaintance, and organization with which he is allowed association, we ask that the Court direct the government to submit its own list of organizations or persons that it seeks to prohibit him from contacting.

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
(206) 622-8000

**VII.      Conclusion**

For all of the reasons expressed above, the defense will recommend a sentence on June 4 that is within the range contemplated by the plea agreement.  We ask that the Court respect the plea agreement reached by the parties and sentence Mr. McGowan accordingly.


Respectfully submitted this 29th day of May, 2007.

SCHROETER, GOLDMARK & BENDER


*s/ Amanda E. Lee*
AMANDA E. LEE
JEFFERY P. ROBINSON
Counsel for Defendant Daniel McGowan

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
(206) 622-8000

**CERTIFICATE OF SERVICE**

I hereby certify that on May 29, 2007, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to the

following:  Assistant United States Attorney Kirk Engdall.

 s/ Andrea Crabtree
ANDREA CRABTREE
Paralegal
SCHROETER GOLDMARK & BENDER
810 Third Avenue, Suite 500
Seattle, WA  98104
Phone:  (206) 622-8000
Fax:  (206) 682-2305
Email:  crabtree@sgb-law.com

SENTENCING MEMORANDUM – 34